COMMONWEALTH *vs.* CHARLES DYOUS.

Plymouth. January 11, 2002. - May 7, 2002.

Present: MARSHALL, C.J., SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Capital case, Grand jury proceedings, Witness, Instructions to jury, Assistance of counsel. *Evidence,* Joint venturer, Grand jury proceedings, Immunized witness, Credibility of witness. *Grand Jury. Witness,* Immunity, Credibility. *Malice.*

The judge at the trial of an indictment for murder in the first degree properly denied a motion to dismiss the indictment on the ground that the prosecutor had impaired the integrity of grand jury proceedings by intentionally making a false and deceptive presentation of evidence, where the testimony of an immunized witness before the grand jury, while different from a statement he had given previously to the police, did not contradict the earlier statement, and the prosecutor had no obligation to disclose the earlier statement. [722-724]

Where, at a criminal trial, defense counsel had vigorously impeached the credibility of an immunized witness during cross-examination, the prosecutor did not improperly enhance the credibility of the witness by eliciting, on a single occasion during redirect examination, testimony that the witness was subject to prosecution if he failed to testify truthfully; further, although the prosecutor should not have specified that a single justice of this court had granted immunity to the witness, such error did not result in a substantial likelihood of a miscarriage of justice, where the prosecutor did not suggest that such a proceeding increased the likelihood that the witness was telling the truth, and where the judge's instructions to the jury on immunized testimony and the credibility of witnesses in general adequately insured that the witness's credibility was not improperly enhanced. [724-728]

There was no evidence to support a criminal defendant's claim that the prosecutor elicited false or misleading testimony from an immunized witness to the effect that neither the witness nor his attorney requested his immunity, that the witness did not know from what charges he had been immunized, and that the witness's recorded interview with police lasted no more than fifteen minutes; further, the witness's testimony that he had received nothing from the Commonwealth in exchange for his testimony could reasonably be understood to mean that he had received no assistance other than the immunity from the Commonwealth in exchange for his testimony, and therefore was not false or misleading. [728-729]

The decision of the judge at a murder trial to allow an immunized witness to testify to the meaning of the phrase "wet them up" was not erroneous, where the evidence was relevant and its probative value was not outweighed by its prejudicial effect. [729]

At a murder trial, the judge's initial decision not to instruct the jury on involuntary manslaughter did not deny the defendant the right to argue that defense to the jury effectively, where the defendant was not actually entitled to such an instruction on the evidence in the case, and where the defendant may well have benefited from the judge's belated decision to give the instruction, in that defense counsel received a second opportunity to emphasize the factual bases for his theories of manslaughter. [729-732]

At the trial of an indictment charging murder in the first degree on a theory of deliberate premeditation as a joint venturer, the judge's instructions regarding malice properly required that the jury find beyond a reasonable doubt that the participants in the joint venture were acting in accordance with a decision and a plan to kill when they killed the victim. [732-734]

A criminal defendant failed to demonstrate that either his trial counsel or his first appellate counsel rendered ineffective assistance under the circumstances of the case. [734-735]

INDICTMENT found and returned in the Superior Court Department on July 21, 1992.

The case was tried before *James F. McHugh, III*, J., and motions for a new trial, filed on December 15, 1997, and December 17, 1999, respectively, were heard by him.

*John M. Thompson* for the defendant.

*John E. Bradley*, Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. In November, 1994, the defendant was convicted of murder in the first degree on the theory of deliberate premeditation as a joint venturer. In December, 1997, represented by new counsel, the defendant filed a motion for a new trial, which was denied by the trial judge after a hearing. In December, 1999, represented by a third attorney, the defendant filed a second motion for a new trial, which was also denied by the trial judge. He now appeals from the jury verdict and from the denial of his motions for a new trial.

The defendant first challenges the integrity of the grand jury proceedings leading to his indictment. He next points to alleged errors concerning the admission of certain testimony of a key witness for the Commonwealth. Third, he takes issue with the judge's delay in not deciding to instruct on involuntary manslaughter until after defense counsel had made his closing argument. The defendant also takes exception to various instructions to the jury. Finally, he makes a claim of ineffective as-

sistance of counsel (trial and first appellate counsel) stemming primarily from these same claims of error. We affirm the conviction and the orders denying the defendant's motions for a new trial. We conclude that there is no basis to grant relief under G. L. c. 278, § 33E.

1. *Facts.* Viewed in its light most favorable to the Commonwealth, the evidence is as follows. On the evening of November 2, 1991, the defendant and several friends attended a party in Brockton. At the party, Stephen Fernandes, Timothy Lucas, and the defendant, along with several others, formed a plan to kill the victim.[1] Fernandes stated that he was "sick" of the victim because of an incident some weeks earlier in which the victim had threatened him with a gun. Lucas agreed, and the defendant added that he was "sick of them bitches" and that he wanted to "go wet them up." According to an immunized witness, Jordan Martel Rice, who was present during this conversation, this meant to "kill" the victim. The defendant, Lucas, and Fernandes specifically mentioned the names of four persons they were going to shoot, among them the victim and a cousin of the victim. Several of the coventurers had guns, including the defendant, who had a .22 caliber revolver. Acting on their plan, the defendant and the others left the party at approximately 2 A.M. and drove to an apartment complex where the victim lived. Rice drove one of two automobiles, with the defendant sitting next to him and two other men in the back seat.[2] Rice saw that all three men had guns; he also heard noises from the back seat that sounded like guns being loaded. One of the passengers in the back seat suggested that care be taken not to leave any fingerprints on the bullets.

Arriving at the complex where the victim lived, the defendant

---

[1]Stephen Fernandes and another coventurer were convicted of murder in the first degree. See *Commonwealth* v. *Fernandes*, 427 Mass. 90 (1998); *Commonwealth* v. *Fernandes*, 425 Mass. 357 (1997). Timothy Lucas and two other coventurers were convicted of murder in the second degree. See *Commonwealth* v. *Kindell*, 44 Mass. App. Ct. 200 (1998); *Commonwealth* v. *Moore*, 41 Mass. App. Ct. 1103 (1996); *Commonwealth* v. *Lucas*, 39 Mass. App. Ct. 1114 (1995).

[2]Rice left the party at the same time as the coventurers, but had not planned to go with them to the victim's apartment. According to Rice, when the defendant's own automobile became inoperable, Rice was forced to drive the defendant and two others to the victim's home.

spoke to the group about an escape route. Eight men (not includ-
ing Rice) then entered the complex, five of whom, including the
defendant, carried guns. The victim and his cousin were sitting
in the victim's automobile, which was parked in front of the
victim's apartment, engaged in conversation. The automobile
was parked almost directly under a street light. The coventurers
approached the automobile and opened fire from the driver's
side, riddling the vehicle with bullets: at least twenty-one shots
were fired. Ten hit the driver's side windows, clustered on the
front window where the victim was sitting. The victim was hit
four times — three times in the torso and once in the elbow. He
died from his wounds. Three .22 caliber bullets, consistent with
having been fired from a revolver, were later recovered from
the scene, one from the victim's automobile and two from the
ground nearby. The victim's cousin, sitting on the passenger
side of the automobile, was not hit by any gunfire.

The eight men returned to their waiting automobiles and
drove away from the complex. In the automobile driven by
Rice, he again saw that the defendant (sitting next to him) and
the two other passengers carried guns. One back seat passenger
said, "I had to get him, because I shot up the whole front
windshield," to which the defendant added, "We had to get
him, because we all shot." The other back seat passenger asked
to whom the targeted automobile belonged, and the defendant
replied that it belonged to the victim. The passenger then
replied, "[The victim] got his, then."

The next afternoon, Rice was summoned to a meeting by one
of the coventurers, at which the defendant admonished those
involved in the incident: "No snitching." They discussed a
story to tell the police, and what to do with their guns.
Ultimately they decided to tell the police nothing, but to blame
the shooting on others who had also attended the party.

2. *Integrity of grand jury proceedings.* In a pro se brief, see
*Commonwealth* v. *Moffett*, 383 Mass. 201 (1981), the defendant
renews his contention made at trial that the Commonwealth
impaired the integrity of the grand jury proceedings by
intentionally making a false and deceptive presentation of

evidence.[3] He challenges the judge's denial of a motion to dismiss the indictment on those same grounds. We affirm that decision.

A prosecutor may not intentionally withhold evidence that is likely to affect the grand jury's decision to indict, *Commonwealth* v. *Connor*, 392 Mass. 838, 854 (1984), for to do so impairs the integrity of the grand jury. See *Commonwealth* v. *LaVelle*, 414 Mass. 146, 150 (1993); *Commonwealth* v. *Shea*, 401 Mass. 731, 734 (1988). The defendant claims that the grand jury testimony of Rice (then immunized) was false and misleading, adding that the prosecutor deceptively withheld from the grand jurors an earlier statement made by Rice to the police, which the defendant claims was different in material respects from Rice's grand jury testimony.[4] The defendant is correct that Rice did not, in his earlier statement, specify that the defendant was one of the coventurers who carried a gun. But he did not affirmatively tell the police that the defendant did not carry a gun. Rice's earlier statement did not contradict his grand jury testimony, nor did it exculpate the defendant.[5] The prosecutor was not obliged to disclose the earlier statement. *Commonwealth* v. *McGahee*, 393 Mass. 743, 746-747 (1985).

Evidence that Rice initially had told the police that he had no knowledge of the coventurers' intent when they left the party would not likely have made a material difference to the grand jury's determination that there was probable cause to indict the

---

[3]The defendant's appellate counsel also advanced this argument.

[4]Rice's earlier statement differs from his grand jury testimony on several points. Rice first told the police that he had no knowledge of any discussion at the party of where the defendant and others were going, or what they were intending to do. He testified before the grand jury that he had heard the defendant say, in reference to the victim and others, that he "want[ed] to go wet someone up." Next, Rice's earlier statement to the police was unclear on the issue of which of the coventurers carried guns: he said only that he saw two men, not identifying the defendant, with nine millimeter handguns, and that he "believe[d] more people that ran in[to] the [complex] had guns, too." He later told the grand jury that he saw the defendant among the men who entered the complex carrying guns. Last, in his earlier statement he did not identify the defendant as one of the coventurers who returned from the complex carrying a gun, while Rice testified to the grand jurors that, on the men's return from the shooting, the defendant was indeed carrying a firearm.

[5]At trial Rice testified that his earlier statement to the police was "a quick run" of the events in question.

defendant. See *id.* A jury found, beyond a reasonable doubt, that the defendant was guilty of murder in the first degree. They did so after Rice was subjected to a withering cross-examination on these issues. It is reasonable to assume that, if the grand jury — seeking only probable cause — had known about Rice's prior statement to the police, their decision to indict would not have been affected. See *Commonwealth* v. *LaVelle, supra* at 151 n.2.

3. *Testimony of an immunized witness.* The defendant identifies three claims of error regarding the trial testimony of Rice: (a) that the prosecutor and the judge improperly enhanced Rice's credibility on the stand; (b) that the prosecutor elicited testimony from Rice that he knew or should have known was false or materially misleading; and (c) that the judge erroneously allowed Rice to explain to the jury the meaning of the phrase "wet them up." The defendant did not object at trial to the first two issues, nor did he raise them in his first motion for a new trial; he did raise them in his second motion for a new trial, but the motion judge declined to address them on their merits.[6] See *Commonwealth* v. *Hallet,* 427 Mass. 552, 554 (1998). Accordingly, we review these two claims to determine whether the error, if any, caused a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright,* 411 Mass. 678, 681 (1992). The defendant's third claim — that Rice should not have been allowed to testify to the meaning of the term "wet them up" — was preserved for appellate review by objection at trial. We review this claim for prejudicial error. *Commonwealth* v. *Vinnie,* 428 Mass. 161, 163, cert. denied, 525 U.S. 1007 (1998).

---

[6]Contrary to the defendant's assertion, the motion judge did not determine that the underlying claims regarding the first issue, Rice's enhanced credibility, "were not meritorious." Rather, the judge explicitly declined to address all issues other than whether the defendant's first appellate counsel had provided effective assistance.

The second issue, whether the prosecutor attempted to mislead the jury by presenting false testimony about Rice's immunity, was not properly raised, as the defendant claims, in his pro se memorandum of law in support of his first motion for a new trial. There he argued only that the Commonwealth improperly relied on Rice's allegedly false testimony regarding a different issue: the defendant's possession of a gun at the crime scene and the coventurers' statements of intent. In any event, the judge did not address the issue on the merits in either of the two motions for a new trial.

(a) The defendant's claim that the prosecutor and the judge improperly enhanced Rice's credibility on the stand is twofold: (i) that the prosecutor vouched for Rice's credibility by referring to the immunity hearing before a single justice of this court, and (ii) that the judge gave an erroneous statutory immunity instruction and failed to give a specific cautionary instruction regarding the testimony of immunized witnesses.

As to the first, in his opening statement to the jury the prosecutor said that Rice had been granted immunity by the Supreme Judicial Court. He subsequently elicited testimony of that fact from Rice: on redirect examination, Rice testified that he believed immunity meant he "[could] tell the truth without being prosecuted," and that, during the immunity hearing, the single justice informed him he could be prosecuted for perjury or contempt of court if he did not tell the truth. In his closing argument the prosecutor again reminded the jury that Rice had been granted immunity, which he described as a "license to tell . . . the truth."

In *Commonwealth* v. *Ciampa*, 406 Mass. 257, 262-264 (1989), we concluded that prosecutorial references to the obligation of an immunized witness to tell the truth or risk a heavy sanction should be placed in evidence by a prosecutor, if at all, only on redirect examination in response to impeachment of the immunized witness. We added that references to the witness's obligation to tell the truth should not be given undue repetition by the prosecutor. See *id.* at 262. See also *Commonwealth* v. *Gagliardi*, 29 Mass. App. Ct. 225, 241-242 (1990) (applying *Commonwealth* v. *Ciampa*, *supra*, to immunized testimony).

After Rice's credibility had been vigorously impeached by defense counsel,[7] the prosecutor only once elicited from Rice testimony that he was subject to prosecution for perjury if he failed to testify truthfully. In those respects the prosecutor

---

[7]Defense counsel elicited testimony on cross-examination that Rice had pleaded guilty to assault and battery by means of a dangerous weapon; that he had deliberately lied when he first spoke to the police in November, 1991; and that he had made various inconsistent statements to the police and in his testimony at various trials of the coventurers. Defense counsel then questioned Rice about receiving immunity, and suggested that immunity had relieved him from an indictment for murder.

conformed to our admonitions. See *Commonwealth v. Ciampa, supra.* See also *Commonwealth* v. *Gagliardi, supra* at 240-241.

But there is one aspect of the challenged testimony that was improper: the prosecutor specifically invoked the name of the justice (as well as the name of the court) who had granted immunity to Rice.[8] It is irrelevant how or by whom a witness is granted immunity, and prosecutors should not elicit such testimony. See *Commonwealth* v. *Sullivan*, 435 Mass. 722, 728 (2002);[9] *Commonwealth* v. *Hardy*, 431 Mass. 387, 396 (2000).[10] The error here did not, however, result in a substantial likelihood of a miscarriage of justice. The prosecutor did not convey to the jury a suggestion that the proceeding before the single justice enhanced the likelihood of Rice's telling the truth. Compare *id.*, with *Commonwealth* v. *Sullivan, supra.* And as discussed below, the judge's instructions regarding immunized testimony were sufficient to offset any possibility that the jury may have perceived Rice's credibility to be enhanced. See *Commonwealth* v. *Hardy, supra* at 397-398.

---

[8]The questioning was as follows:

THE PROSECUTOR: "And by the way, you went up to the Supreme Judicial Court in Boston for an immunity hearing with a justice of the Supreme Judicial Court, didn't you?"

THE WITNESS: "Yes, I did."

THE PROSECUTOR: "And at that point, did [the single justice] indicate to you as part of your immunity what you could be prosecuted for?"

"  . . .

THE WITNESS: "Yes, he did."

THE PROSECUTOR: "And what's your understanding, as part of the immunity, what you can be prosecuted for?"

THE WITNESS: "Perjury."

THE PROSECUTOR: "And what else?"

THE WITNESS: "Contempt of court."

[9]In *Commonwealth* v. *Sullivan*, 435 Mass. 722, 726-727 (2002), the prosecutor stated: "[This immunized witness] was granted immunity by the Supreme Judicial Court and he was forced to testify. 'Now [immunized witness], you're not gonna get by so easily as not being involved and not testifying against your friends. You are going to testify. And the only way you can get in trouble is if you lie.' "

[10]In *Commonwealth* v. *Hardy*, 431 Mass 387, 396 n.7 (2000), the prosecutor stated: "The . . . Supreme Judicial Court . . . said, 'Mr. [immunized witness], you are going to testify or you're going to be held in contempt and go to jail, and you'd better not lie. . . . You could be prosecuted for perjury.' "

Because of the persistence of this issue, we now make clear that henceforth a prosecutor may not specify that a grant of immunity has been made by a particular judge, or in a particular court. The source of a grant of immunity is not relevant, and the potential to mislead the jury is significant. The prosecutor may elicit only that the witness has been granted immunity, and the sanctions that may flow if the witness does not tell the truth. That is all.

As to the judge's instructions on immunity, these were adequate to ensure that Rice's credibility was not improperly enhanced.[11] The defendant did not request, and we do not require, that a judge give cautionary instructions specifically mentioning a particular immunized witness. *Commonwealth* v. *Brousseau*, 421 Mass. 647, 654-655 (1996). Rather we consider whether "the charge, as a whole, adequately covers the issue." *Commonwealth* v. *Anderson*, 396 Mass. 306, 316 (1985). The instruction correctly indicated that immunized testimony could not serve as the sole basis for a conviction. *Commonwealth* v. *DeBrosky*, 363 Mass. 718, 730 (1973). G. L. c. 233, § 20I. The judge also gave the jury general instructions on the credibility of witnesses, encouraging them to consider potential bias and motives for testifying. The instructions as a whole were sufficient to offset any conceivable harm by the prosecutor's minimal reference to Rice's obligation to tell the truth under his

---

[11]The judge gave the following instruction on immunity:

"Now, a witness who's been granted immunity and who subsequently testifies cannot be prosecuted on account of the matter about which the witness testifies, except for perjury committed while the witness is testifying. A defendant cannot be convicted solely on the testimony of a person granted immunity.

"To ensure that the credibility of testimony given by an immunized witness, it is required only that there be some evidence in support of the testimony of an immunized witness on at least one element of proof essential to convict the defendant. Thus, evidence corroborating an accomplice's testimony concerning the commission of the crime would be sufficient, even if there were no other evidence connecting the defendant to the crime.

"Independent evidence establishing that the defendant committed the crime is not required under the statute. The purpose of requiring some corroboration, however, is to require support for the credibility of the immunized witness. That support may come as much in the form of corroboration of evidence in the commission of the crime as it does from proof that the defendant was a participant."

grant of immunity, and to focus the jury's attention on the care with which they were to assess his testimony. See *Commonwealth* v. *Ciampa, supra* at 266.

(b) We next consider the prosecutor's alleged elicitation of false and materially misleading testimony from Rice, viz., (i) that neither Rice nor his attorney requested his immunity; (ii) that Rice did not know from what charges he had been immunized; (iii) that Rice's recorded interview with the police on January 22, 1992, lasted no more than fifteen minutes; and (iv) that Rice received nothing from the Commonwealth in exchange for his testimony.

There is no evidence that Rice's testimony was false or materially misleading concerning the first three claims. The transcript of the immunity hearing before the single justice indicates only that Rice's attorney supported the Commonwealth's petition for immunity. Next, defense counsel's question on cross-examination asked Rice whether he would have been charged with murder but for his immunity.[12] Rice's answer, that he did not know, is not contradicted by his testimony at the trial of Karl A. Moore, where he testified that he knew he *could* not be charged with murder because of his immunity.[13] Last, the recorded statement on which defense counsel relied to impeach Rice's testimony did last fifteen minutes.[14]

The defendant supports his fourth claim, that Rice falsely testified that he received nothing from the Commonwealth in

---

[12]Defense counsel asked Rice, "[You received immunity] [f]rom the charge of what, sir? . . . Murder, isn't that right?" Rice answered: "I don't know what they was going to charge me with. I don't know."

[13]The defendant has not provided the relevant excerpts from the trial transcript. He offers only the Appeals Court's unpublished memorandum and order pursuant to its rule 1:28, which states: "[Rice] knew he could not be charged with murder as a result of the grant of immunity." See note 1, *supra*; *Commonwealth* v. *Moore*, 41 Mass. App. Ct. 1103 (1996).

[14]The prosecutor's emphasis in closing on that point was not misleading. The prosecutor argued: "And [Rice] talked about . . . that extensive interview by the police that was fifteen minutes long. . . . My direct examination, your memory will judge, but wasn't it at least an hour? [Defense counsel] then questioned him from, what, ten o'clock to three o'clock? But he wants to blame the police or Mr. Rice, either one, for not eliciting all these details in a fifteen-minute interview."

exchange for his testimony, with evidence that the Commonwealth sought and obtained Rice's immunity. The jury knew that Rice drove one of the two automobiles that carried the defendant and others to and from the murder scene, and attended a meeting the next day at which the cover-up plan was discussed. They were also well aware that the prosecutor's office had petitioned for and obtained Rice's immunity, and were cognizant that immunity meant he could not be prosecuted for his involvement in the crime. In this context, Rice's testimony may reasonably be understood to mean that he received no assistance other than immunity from the Commonwealth in exchange for his testimony. The testimony was not false or misleading.

(c) Last, the judge's decision to allow Rice to testify to the meaning of the phrase "wet them up" was not erroneous. A judge's decision that evidence is relevant and that the probative value of relevant evidence is not outweighed by its prejudicial effect will be upheld absent palpable error. *Commonwealth* v. *DiMonte*, 427 Mass. 233, 243-244 (1998). The evidence was unquestionably relevant to the central issue of the joint venturers' intent. Rice testified that he had heard the phrase used before; the testimony of his understanding of his friends' and associates' expressions and use of language was properly admissible. See *Commonwealth* v. *Henderson*, 434 Mass. 155, 160 (2001). See, e.g., *Commonwealth* v. *Anderson*, 425 Mass. 685, 687 & n.5 (1997) (witness testified that "cap him" meant to "fire a pistol or shoot"); *Commonwealth* v. *Strahan*, 39 Mass. App. Ct. 928, 929 (1995) (ship's mate "took the defendant's remarks as a threat to sink the boat").

4. *Involuntary manslaughter instruction.* Defense counsel filed written requests for jury instructions, among them a request that the judge give a charge on involuntary manslaughter, which he renewed during the charge conference.[15] The judge informed counsel that he would not give the requested instruction.

---

[15]The defense theory was that the coventurers intended only to shoot into the air. The judge explicitly considered and rejected that theory because there was no evidence that the coventurers shot into the air, and all the evidence indicated that they shot at or into the automobile. He also rejected the theory that the coventurers intended only to vandalize the automobile, because there was no evidence of such an intent.

Despite this, in his closing argument defense counsel drew the jurors' attention to the facts that he believed were not consistent with an intent to commit murder — the same facts that counsel had informed the judge supported his theories of involuntary manslaughter. See note 15, *supra.* He emphasized that the shooting took place on a foggy night, and that there was nothing to suggest to the coventurers that anyone was sitting in the victim's automobile at 2 A.M. He reminded the jury of the testimony of the only percipient witness, the victim's cousin, that the engine, radio, wipers, headlights, and interior lights of the automobile were off, and that the seats were reclined, so that "you can't see." Turning specifically to address intent, he argued that the Commonwealth had established an intent, if any, only "to shoot up in the air."

Subsequently, at sidebar, the judge stated that, as he listened to the summation, he realized he had overlooked the testimony that the victim and his cousin were "in the car lying down, reclining." It was thus "conceivable," he said, that the jury could find that the defendant did not know "that there was anybody in the car into which they were shooting." He would therefore give the jury an instruction on involuntary manslaughter. The judge gave defense counsel "a couple of minutes" to decide whether he wished to make another closing argument. Defense counsel made a perfunctory request for a mistrial,[16] which the judge denied, and then made a second closing argument.

The defendant argues that the judge's initial refusal to instruct the jury on involuntary manslaughter denied him his right to argue that defense to the jury effectively. He first raised this issue in his first motion for a new trial, where it was addressed by the trial judge on its merits.[17] We therefore review for prejudicial error. *Commonwealth* v. *Hallet,* 427 Mass. 552, 554 (1998). Rule 24 (b) of the Massachusetts Rules of Criminal

---

[16]Defense counsel's entire argument on this point is as follows: "One, to protect the record, I ought to move for a mistrial and suggest that I was thrown off to some degree and was compelled to argue without the knowledge your Honor was going to instruct on manslaughter."

[17]The defendant raised several additional issues in a pro se memorandum of law in support of his first motion for a new trial. The motion judge deemed all issues other than the involuntary manslaughter claim waived.

Procedure, 378 Mass. 895 (1979), requires that the judge "inform counsel of his proposed action upon requests [for jury instructions] prior to their arguments to the jury." As we shall explain, the judge's failure to do so in this case did not prejudice the defendant. See *Commonwealth* v. *Thayer*, 418 Mass. 130, 134 (1994); *Commonwealth* v. *Pettingel*, 10 Mass. App. Ct. 916, 917 (1980).

If any view of the evidence would permit a verdict on manslaughter, rather than murder, a manslaughter charge should be given. *Commonwealth* v. *Brooks*, 422 Mass. 574, 578 (1996). In making this determination, we draw all reasonable inferences from the evidence in favor of the defendant. *Commonwealth* v. *Nichypor*, 419 Mass. 209, 216 (1994). The instruction is not required where it is obvious from the evidence that, "if there was a risk of harm arising from the [act], it was the kind of risk (likelihood of death) that could only lead to a finding of malice." *Commonwealth* v. *Sires*, 413 Mass. 292, 303 (1992). We conclude that the defendant was not entitled to an involuntary manslaughter instruction in this case.

There was overwhelming evidence that the coventurers shot at the victim as he sat in his automobile; there was no evidence that they discharged their weapons believing no one was in the automobile. The only percipient witness to the shooting, the victim's cousin who was seated next to the victim, testified that he did not believe there was anything to indicate that anyone was in the automobile. He was in no position to determine what could be seen from outside. Moreover, despite the fog, the victim's cousin testified that from his position in the passenger seat, he was able to make out the victim's mother's apartment, fifty feet across the parking lot. The victim's automobile was parked almost directly under a functioning street light. An officer who responded to the call that there had been a shooting was able to see through the windshield into the automobile. The right rear window of the automobile was missing, and the victim and his cousin were talking when the assailants arrived. When the coventurers came on this scene, they acted as if they believed someone were in the automobile. They focused their fire on where the victim was sitting: of the twenty-one shots fired in close proximity to the automobile, ten hit the windows next to the victim. Four shots hit the victim, killing him.

There was no evidence at trial that the coventurers had ever intended only to vandalize the victim's automobile.[18] Testimony from which the jury might have found an intent to shoot in the air could not have supported an involuntary manslaughter verdict because, as the judge correctly ruled, there was no evidence that anyone fired into the air or that the victim died as a result of firing into the air.[19] The remaining evidence of intent pointed singularly to an intent to kill. The defendant said that he wanted to "wet up," i.e., kill, the victim. He acted on that intent by bringing a .22 caliber revolver to the victim's apartment complex, and entering with seven other men, four of whom were armed. Immediately after the murder the coventurers gloated that their endeavor had been successful, with the defendant remarking, "We had to get him, because we all shot." He also said the automobile into which they had fired belonged to the victim.

We also note that the defendant may well have benefited from the judge's belated decision to give the instruction. Defense counsel received a second opportunity to emphasize the factual bases for his theories of manslaughter, and he did so. He made a more focused, powerful argument than he had in his first summation that there was nothing to put the coventurers on notice that there was anyone in the automobile. The defendant also received a second opportunity to stress his defense to murder: that the Commonwealth had failed to establish an intent to kill at the time of the shooting. Finally, as the judge noted in his ruling on the defendant's first motion for a new trial, the jury could possibly have inferred that some aspect of the initial summation led the judge to believe that manslaughter, rather than murder, was in fact an appropriate verdict. Nothing undermined or impeded the defendant's arguments on the legal issues properly before the jury. There was no prejudice.

5. *Malice instructions.* The judge defined all three prongs of malice, but failed to instruct the jury that only the first prong of malice was applicable to murder in the first degree committed

---

[18]Rice was impeached with testimony from a prior trial in which he had specifically denied that the men intended to shoot the victim's empty automobile. See note 15, *supra.*

[19]On appeal the defendant does not press this argument.

with deliberate premeditation. See *Commonwealth* v. *Jenks*, 426 Mass. 582, 585 (1998). Because there was no objection, we review to determine whether there was a substantial likelihood of a miscarriage of justice.[20] See *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992). The judge instructed that, in order for the jury to find deliberate premeditation, the Commonwealth had to prove that "the killer or killers formed a plan to kill [the victim] after thinking about doing so," and that deliberate premeditation required, first, "the decision, then a plan, then a critical evaluation of the pros and cons of proceeding with the plan, and lastly, action in accordance with that plan." The instruction required a finding of purposeful conduct that included a finding beyond a reasonable doubt of a specific intent to kill, a finding that inherently satisfies first prong malice. See *Commonwealth* v. *Reaves*, 434 Mass. 383, 394 (2001); *Commonwealth* v. *Diaz*, 426 Mass. 548, 554 (1998).

The defendant argues, however, that because the deliberate premeditation instructions did not explicitly focus on the time of the killing, the jury could have found deliberate premeditation at the party or en route to the scene of the crime, and nevertheless still find that, at the scene, the joint venturers' state of mind was not a specific intent to kill. We disagree. Twice the judge emphasized that the Commonwealth's burden was to prove beyond a reasonable doubt that the killing itself was committed with deliberate premeditation.[21] When read as a whole, see *Commonwealth* v. *Carrion*, 407 Mass. 263, 270 (1990), the instruction required that the jury find beyond a reasonable doubt, not merely that the participants in the joint venture carried out some "action" in accordance with a plan to kill, but that, when

---

[20]The issue was first raised by the defendant in his second motion for a new trial. The judge treated the issue as waived under Mass. R. Crim. P. 30 (c) (2), 378 Mass. 900 (1979), and did not resurrect it for purposes of appellate review. See *Commonwealth* v. *Hallet*, 427 Mass. 552, 553-554 (1998). He addressed only the defendant's claim that his prior appellate counsel was ineffective in not raising it in the first motion for a new trial.

[21]In instructing on deliberate premeditation, the judge specified that the Commonwealth must prove beyond a reasonable doubt that "the *killing* was committed with deliberate premeditation," and that "the person or persons who *killed* [the victim] did so with deliberate premeditation" (emphasis added).

they killed the victim, they were acting "in accordance with [a decision and a] plan [to kill]."

The defendant presses two other arguments on the judge's malice instructions. He challenges the instruction that the jury "may, but . . . need not, infer an intent to kill from the use of deadly force." The instruction was correct. See *Commonwealth v. Albert*, 391 Mass. 853, 860-861 (1984). He also claims that the instructions erroneously failed to specify the Commonwealth's burden of disproving, beyond a reasonable doubt, the elements of involuntary manslaughter. The Commonwealth bears no such burden. Cf. *Commonwealth v. McLaughlin*, 433 Mass. 558, 561 (2001) (Commonwealth must disprove "reasonable provocation" where raised by evidence).

6. *Ineffective assistance of counsel.* The defendant asserts ineffective assistance of trial counsel, and of his first appellate counsel, in various respects. To prevail he must show that defense counsel's errors were "likely to have influenced the jury's conclusion." *Commonwealth v. Wright*, 411 Mass. 678, 682 (1992). Neither trial nor appellate counsel was ineffective.

The defendant takes issue with trial counsel's failure to request five jury instructions. The first of these, that malice must be determined at the time of the shooting, was given by the judge. The second, that the Commonwealth must prove that the defendant knew or believed the automobile to be occupied at the time of the shooting, was not required. The Commonwealth was required to prove only a specific intent to kill to support the jury's verdict. See Model Jury Instructions on Homicide 8 (1999). The third instruction that trial counsel failed to request, that the coventurers' conduct after the shooting was not relevant to the issue of deliberate premeditation, would have been incorrect as a matter of law. Conduct after the killing need only have a "rational tendency to prove a material issue" to be relevant to deliberate premeditation. *Commonwealth v. Simpson*, 434 Mass. 570, 579 (2001), quoting *Commonwealth v. Martinez*, 431 Mass. 168, 173 (2000). The discussion in the getaway car and at the cover-up meeting were relevant because they tended to prove the existence of a criminal enterprise to kill the victim in which the defendant was involved as a joint venturer.

The fourth instruction that counsel failed to request was that

malice can be inferred from the use of a dangerous weapon only if the weapon is used against a person. The instruction was not required: there was no question that the victim died because dangerous weapons were used against him. The defendant last claims that trial counsel was ineffective for failing to request a specific cautionary instruction with regard to Rice's testimony and for failing to object to the given instruction on immunized testimony. As discussed above, the judge's instruction was not erroneous and was adequate to address the issue.

The defendant claims his first appellate counsel was ineffective for failing to raise in his first motion for a new trial challenges to the alleged prosecutorial vouching and the instruction on immunized witnesses, to the alleged presentation by the prosecution of false testimony, and to the malice instructions. He asserts that the failure to raise these claims denied him the benefit of their consideration by the motion judge for resurrection under *Commonwealth* v. *Hallet*, 427 Mass. 552, 554 (1998). With regard to the first two issues, there was no error at trial. Review of the erroneous malice instruction for prejudice (assuming the motion judge would have addressed the issue on the merits) would have gained nothing for the defendant: the emphatic deliberate premeditation charge eliminated the risk that the jury could have convicted the defendant on anything less than a specific intent to kill. See *Commonwealth* v. *Diaz*, 426 Mass 548, 554 (1998). None of these underlying issues prejudiced the defendant's trial. He cannot prevail by asserting as to the same issues the ineffectiveness of his counsel. See *Commonwealth* v. *Wright*, *supra*.

7. *G. L. c. 278, § 33E.* We have reviewed the record. There is no reason to exercise our power under G. L. c. 278, § 33E, to order a new trial or to reduce the verdict.

*Judgment affirmed.*

*Orders denying motions for a
new trial affirmed.*